UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LINDA GATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:17-CV-02320-NCC |
| | ) |
| ROBERT CARDILLO, Director, | ) |
| National Geospatial Intelligence Agency, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Robert Cardillo's ("Defendant") Motion for Summary Judgment (Doc. 42). The Motion is fully briefed and ready for disposition. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 8). For the following reasons, Defendant's Motion will be **GRANTED** and this action will be **DISMISSED, with prejudice**.

### I. Background

On April 26, 2017, *pro se* Plaintiff Linda Gates ("Gates") filed this action for employment discrimination in the Circuit Court of St. Louis County Missouri (Doc. 3). On August 28, 2017, Defendant timely removed the matter to this Court (Doc. 1). On March 22, 2018, the Court granted Defendant's Motion to Dismiss and afforded Gates an opportunity to file an amended complaint within thirty days of the date of the Order (Doc. 12). On April 18, 2018, in compliance with the Court's Order, Gates timely filed an amended complaint alleging employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and the American with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, *et seq.* ("ADA") for the termination of her employment, terms

and conditions of her employment differing from those of similar employees, harassment, and other conduct, specifically "bullying," because of her disability which she notes as her need to wear a defibrillator (Doc. 13). The undisputed facts are as follows.[1]

Plaintiff Linda Gates was hired by the National Geospatial Intelligence Agency ("NGA") effective October 24, 2010 as a Contract Specialist-DAWIA (Defense Acquisition Work Improvement Act) (Doc. 44-2). Gates indicated on her resume that she was an experienced Contract Specialist (Doc. 44-21 at 12). Gates' position was for a probationary period of two

---

[1] The facts are taken from Defendant's Statement of Uncontroverted Material Facts ("SOF") and associated exhibits (Doc. 44). Gates did not fully respond to Defendant's uncontroverted facts, instead filing a Response which includes a number of facts Gates disputes (Doc. 46). Gates also attaches a number of exhibits to her response including: (1) a portion of the deposition of Susan Tatterson Kajuch; (2) the deposition of Susan Pollmann; (3) the deposition of Patricia A. Hughes; (4) the deposition of Lynne M. Ware; (5) the exhibits to Lynne M. Ware's Memorandum of Record dated May 9, 2012; and (6) the deposition of Gates (*See* Doc. 46-1 to 46-7). Local Rule 4.01(E) provides with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 4.01(E). As a result of Gates' failure to meet the requirements of Local Rule 4.01(E), Gates is deemed to have admitted all facts in Defendant's Statement of Uncontroverted Material Facts. *Turner v. Shinseki*, No. 4:18-CV-1910 CAS, 2010 WL 2555114, at *2 (E.D. Mo. June 22, 2010) (citing *Deichmann v. Boeing Co.*, 36 F.Supp.2d 1166, 1168 (E.D. Mo. 1999)). However, Gates' failure to respond properly to Defendant's Motion for Summary Judgment does not mean summary judgment should be automatically granted in favor of the Defendant. Even if the facts as alleged by Defendant are not in dispute, those facts still must establish he is entitled to judgment as a matter of law. *Cross v. MHM Corr. Servs., Inc.*, No. 4:11CV1544 TIA, 2014 WL 5385113, at *3 (E.D. Mo. Oct. 10, 2014).

years (Doc. 44-21 at 6). On October 27, 2010, Gates suffered a cardiac arrest while on duty at NGA (Doc. 44-4). Gates returned to work in early January 2011 (Doc. 44-7; Doc. 44-21). However, as a result of the incident, Gates has an internal defibrillator (Doc. 44-4). Upon her return, Gates completed a NGA Form 6200-1, Medical History & Respirator Questionnaire indicating, in relevant part, that she had an Implantable Cardioverter Defibrillator ("ICD") implanted in November 2010 (Doc. 44-7). As a result of the defibrillator, Gates ability to sleep as well as her ability to walk were affected during her time at NGA (Doc. 44-22 at 11). Specifically, Gates testified at her deposition that her sleep was impacted but that the exact nature of the impact was "personal" (*Id.*). Gates further testified that she cannot "walk miles" (*Id.*).[2] There remains a dispute of fact regarding whether Gates discussed any alleged disability with her supervisors during her employment (Doc. 44-21 at 39-40; Doc. 44-22 at 6; Doc. 44-23 at 5, 7; Doc. 44-24 at 6, 14; Doc. 44-25 at 4-5, 24). Nevertheless, Gates was referred to an office within NGA upon her return and the office offered Gates accommodations which are not identified in the record (Doc. 44-21 at 39; Doc. 44-23 at 7; Doc. 44-24 at 7; Doc. 44-25 at 4-5). Gates declined any accommodation (Doc. 44-21 at 39; Doc. 44-24 at 7; Doc. 44-25 at 21-22).

Between Gates' return in January 2011 and roughly May 2011, there is no evidence of any negative feedback regarding Gates' performance (Doc. 44-21 at 36; Doc. 44-25 at 9). On May 3, 2011, Gates' first-line supervisor, Lynne Ware ("Ware"), provided Gates with her Mid-

---

[2] The Court is mindful that during her deposition, Gates felt uncomfortable answering a number of questions regarding her financial status and physical health. Despite defense counsel's tone during the deposition, *see, e.g.* Doc. 44-22 at 4-7, 11-14, the Court found, and continues to hold, that these financial and health questions were relevant to the issue at hand and therefore properly raised during her deposition. However, the Court will only include those statements and facts regarding Gates' financial status and health history that are necessary to address the matter before the Court.

Point Review Comments in a face-to-face meeting (Doc. 44-6; Doc. 44-21 at 18, 35, Doc. 44-25 at 18). Gates was not given a performance rating at the time nor did the review contain any negative comments regarding Gates' performance (Doc. 44-21 at 18; Doc. 44-24 at 13; Doc. 44-25 at 18).[3] On July 28, 2011, Ware met with Gates to discuss Ware's concerns with Gates' performance (Doc. 44-10). In a Memorandum for Record memorializing the meeting, Ware indicated that "[t]his meeting was held to discuss specific areas in [Gates'] performance plan where improvements need to be made" prior to the end of the rating cycle "so that [Gates] would have time to address [Ware's] concerns prior to the end of the rating cycle" (Doc. 44-10). Ware specifically advised Gates that if Ware were to give her a rating at the time of meeting, she would give Gates a "Minimally Successful rating" (Doc. 44-10). Ware asked Gates "if there was anything [Ware] could do to help her improve her performance" (Doc. 44-10). The following day, on July 29, 2011, Gates requested to meet with, and met with, Gates' second-line supervisor Deputy Chief Patricia Hughes ("Hughes") (Doc. 44-6; Doc. 44-11; Doc. 44-13). Hughes reiterated the information presented to Gates by Ware (Doc. 44-14). Also, on July 29, 2011, Ware sent an email to Gates confirming their discussion on July 28, 2011 and noting that, while she would rate Gates in the "Minimally Successful range" if Ware had to do so that day, "[i]f there is anything I can do to help you improve in these areas, please let me know" (Doc. 44-12).

On August 3, 2011, in response to Ware's confirmation email, Gates requested a meeting with Ware and Hughes to get "an understanding as to what I'm not doing to meet my

---

[3] Defendant repeatedly cites to Exhibit H at Document 44-8 for Gates' 2011 Close-Out Evaluation. However, the document at Ex. H does not appear to be Gates' Close-Out Evaluation. It seems to be a copy of Gates' April 20, 2012 Mid-Point Review (*Compare* Doc. 44-8 *with* Doc. 44-16). Regardless, each instance that the 2011 Close-Out Evaluation is referenced in Defendant's SOF, the associated fact is also supported by deposition testimony. Therefore, the Court finds Defendant's failure to include the reference exhibit to be harmless.

performance plan in order to receive a Minimally Successful range . . ." (Doc. 44-13). On August 10, 2011, Ware and Hughes met with Gates and asked whether there was anything they could do to help Gates (Doc. 44-14; Doc. 44-24 at 15). In October 2011, Gates received an overall rating of Minimally Successful on her 2011 Final Close-Out Evaluation (Doc. 44-25 at 80).

On November 2, 2011, Ware submitted Feedback Sheets on the five employees she supervised to the Chief of NGA ACS, Susan Pollmann ("Pollmann") (Doc. 44-6; Doc. 44-15). The other four employees under Ware's supervision were performing at "Successful" or "Excellent" levels (Doc. 44-15). However, Gates was performing at a "Minimally Successful" level and Ware noted that she made "[e]rrors and mistakes . . . not [] expected of someone at her experience level" (Doc. 44-15; Doc. 44-25 at 19). On that same day, Pollmann met with Gates to discuss her evaluation (Doc. 44-23 at 3, 7). Pollmann reviewed the evaluation with Gates and "asked [Gates] to think of the rating not as a failure but as our commitment to help her cover the gaps and become successful" (Doc. 44-23 at 7).

On April 30, 2012, Gates received a second Mid-Point Review covering the period of October 1, 2012 through March 31, 2012 (Doc. 44-16; Doc. 44-8). On May 9, 2012, Ware met with Gates to discuss the Mid-Point Review (Doc. 44-17). Ware positively commented on Gates' abilities in the Customer Collaboration, Engagement and Collaboration, Personal Leadership and Integrity Objectives (Doc. 44-16). However, in the Execution and Documentation objective, Ware indicated that "Ms. Gates lack proficiency in execution of routine contractual actions" (Doc. 44-16). Ware indicated that she was "not seeing improvement" in the objectives of Accountability for Results, Communication, and Critical Thinking (Doc. 44-16; Doc. 44-17).

5

On June 7, 2012, during her probationary two-year period, Gates was terminated (Doc. 44-1; Doc. 44-2; Doc. 44-21 at 7). The termination letter indicated in relevant part, "[b]ased on your performance, I have concluded that it is not in the best interest of NGA to finalize your appointment" (Doc. 44-1 at 1). Gates was subsequently allowed to retire from federal service in lieu of termination, also effective June 7, 2012 (Doc. 44-2).

Gates filed an Equal Employment Opportunity ("EEO") complaint on July 18, 2012 alleging discrimination on the basis of her physical disability "due to forced retirement through the initial termination of employment that occurred on 7 June 2012" (Doc. 44-3; Doc. 44-4 at 1; Doc. 44-5). The NGA Office of Diversity and Equal Employment Opportunity sent Gates a Notice of Acceptance of Discrimination Complaint identifying Gates' claim as being "discriminated against by the [NGA] on the basis of disability (physical) when on June 7, 2012 you were forced to retire in lieu of termination of your employment" (Doc. 44-5). Although Plaintiff had the opportunity to contest the characterization of her claim within five days of receipt of the Notice, Plaintiff did not notify the NGA Office of Diversity and Equal Employment Opportunity that her claim was incorrectly identified (Doc. 44-5; Doc. 44-21 at 13-14). During the EEO investigation, Gates characterized her limited major life activity as "heart limitations" and specifically indicated that, "[t]he limited major life activity limitation is running a marathon and lifting offer [sic] 40 pounds" (Doc. 44-18 at 4; Doc. 44-22 at 5). Otherwise, Gates stated that her need to wear a defibrillator ". . . does not affect my ability to do my job" (Doc. 44-18 at 4; Doc. 44-22 at 8). A Final Agency Decision was entered on August 27, 2014, finding no evidence of discrimination (Doc. 44-18). A decision by the Office of Federal Operations, Equal Employment Opportunity Commission ("OFO") was issued on November 1, 2016, affirming the Final Agency Decision (Doc. 44-19). The OFO denied Gates' Request for

6

Reconsideration on February 2, 2017 and indicated Gates' right to file a civil action (Doc. 44-20). Defendant now moves for summary judgment on Plaintiff's claims (Doc. 42).

## II. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once the moving party demonstrates that there is no genuine issue of material fact, the nonmovant must do more than show there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing a genuine factual dispute that must be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 324. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson*, 477 U.S. at 248). In ruling on a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the non-moving party. *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005). The evidence is not weighed and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III. Analysis

### A. Exhaustion

In her Amended Complaint, Gates alleges that the conduct underlying her employment

discrimination lawsuit includes: (1) termination of her employment, (2) terms and conditions of her employment differ from those of similar employees, (3) harassment, and (4) "bullying" based on her need to wear a defibrillator (Doc. 13 at 4). However, before the EEOC, Gates only alleged "that the Agency discriminated against her on the basis of disability when on June 7, 2012, management forced her to retire in lieu of termination during her probationary period" (Doc. 13 at 13-14; Doc. 44-5). Therefore, regardless whether Gates purports to raise the claims that the terms and conditions of her employment differ from those of similar employees, harassment, and "bullying" based on her need to wear a defibrillator under Title VII or the ADA, these claims must necessarily fail as Gates has not properly exhausted them prior to bringing suit. *Ballard v. Rubin*, 284 F.3d 957, 964 n.6 (8th Cir. 2002). *See also Weakley v. Permalok Corp.*, No. 4:19-CV-259-SPM, 2019 WL 932112, at *3 (E.D. Mo. Feb. 25, 2019) ("Before bringing suit under Title VII or Title I of the ADA, a plaintiff must first file a charge of discrimination with the EEOC, and receive a right-to-sue letter.").

**B. ADA Claims**

Next, to the extent Gates intends to raise her claims under the ADA, the ADA does not apply to disability discrimination claims by federal employees, who can only assert such claims under the Rehabilitation Act of 1973. 42 U.S.C. § 12111(5)(B)(i) (defining the term "employer" as used in the ADA to exclude the United States, or any corporation wholly owned by the government of the United States). The Court could dismiss Plaintiff's remaining claim for this reason alone but, in an abundance of caution and in the interests of justice, the Court will address Plaintiff's remaining claim pursuant to the Rehabilitation Act as it is the relevant, applicable law in the current context. *Lewis v. Johanns*, 180 F. App'x 599, 601 (8th Cir. 2006) (per curium) (noting "only the Rehabilitation Act applies to federal employees").

**C. Rehabilitation Act Claim**

The Rehabilitation Act prohibits discrimination against an otherwise qualified individual with a disability, solely by reason of her disability. *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). To establish disability discrimination under the Rehabilitation Act, Plaintiff must show that she (1) was disabled, (2) was qualified to do the essential functions of her job, and (3) suffered an adverse employment action because of her disability. *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015). The Rehabilitation Act incorporates the standards of the ADA to determine whether a violation has occurred. 29 U.S.C. § 794(d); *Peebles v. Potter*, 354 F.3d 761, 765 (8th Cir. 2004). Decisions under the Rehabilitation Act or the ADA "are applicable and 'interchangeable' to claims under each statute." *Hill*, 737 F.3d at 1216. Defendant does not dispute that Plaintiff was qualified to do the essential functions of her job but instead argues that Plaintiff is not disabled as defined under the statue and that Plaintiff did not suffer an adverse employment action because of her disability.

The threshold question in a disability discrimination case is whether the plaintiff is "disabled" within the meaning of the ADA. *Heisler v. Metropolitan Council*, 339 F.3d 622, 627 (8th Cir. 2003). A plaintiff therefore "must first make a facial showing that [s]he has an ADA disability." *Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). *See also Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001) ("Because [plaintiff] has not met the first element of actual or perceived disability of a prima facie case under the ADA, she is not entitled to protection under the ADA."). The Rehabilitation Act uses the same definition as the ADA for an individual with a disability. 29 U.S.C. § 705(20)(B). The term "disability" is defined as: "(A) a physical or mental impairment that substantially limits one of more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded

as having such an impairment[.]" 42 U.S.C. § 12102(2)(A)-(C). "[M]ajor life activities include but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Though broad, the ADA's definition of disability is not unlimited. Indeed, EEOC regulations specify that "not every impairment will constitute a disability within the meaning of [the ADA and its regulations]." 29 C.F.R. § 1630.2(j)(1)(ii).

Plaintiff's cardiac impairment fails to meet the broad definition of "disability" under the ADA. On October 27, 2010, Gates suffered a cardiac arrest while on duty at NGA and, as a result of the incident, Gates has an internal defibrillator (Doc. 44-4). As Defendant concedes, Gates' heart condition is a physical impairment. 29 C.F.R. § 1630.2(h)(1) (defining a physical impairment to include any physiological disorder or condition affecting the cardiovascular system). Further, several of Gates' major life activities have been affected as Gates' circulatory system has clearly been impacted by her episode and Gates indicates that she has had difficulty sleeping and walking. 42 U.S.C. § 12102(2). However, Gates fails to show that her impairment *substantially limits* a major life activity. Although the term "substantially limits" is to be construed broadly in favor of expansive coverage, Gates must show she is limited in her ability to perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1). While the Court has no doubt that Gates' cardiac incident was severe and the resulting use of a defibrillator is difficult, Gates has not provided any information regarding how her impairment impacts her sleep and being unable to run a marathon, lift over 40 pounds, or walk miles are not activities that most people in the general population can do (Doc. 44-22 at 5, 11). Therefore, because these limitations do not amount to *substantial* limitations on major life

activities under the law, the Court finds that Gates is not disabled within the meaning of the ADA. *See Jewell v. Reid's Confectionary Co.*, 172 F. Supp. 2d 212, 216-17 (D. Me. 2001) ("Because Plaintiff alleges that he fully recovered from his heart attacks with the help of an internal defibrillator, the Court rejects his claim that his heart condition was substantially limiting and that he was actually disabled.").

Even if the Court were to find that Gates is disabled within the meaning of the ADA, the Court cannot find that Gates was terminated *because of* her disability. The ADA prohibits discrimination against a "qualified individual with a disability because of the disability." *Scruggs v. Pulaski Cnty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016) (internal quotation marks omitted). To establish a violation of the Rehabilitation Act, a plaintiff's alleged disability must be the "sole impetus" for any adverse action. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016). In the absence of direct evidence of discrimination, as is the case here, a disability discrimination claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Oehmke v. Medtronic, Inc.,* 844 F.3d 748, 755 (8th Cir. 2016). The plaintiff first has the burden of establishing a causal connection between an adverse employment action and the disability. *Id.* The burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action. *Id.* Finally, the burden shifts back to the employee to show that the proffered reason was, in reality, a pretext for discrimination. *Id.*

Gates fails to establish a genuine issue for trial regarding the causal connection between her alleged disability and her termination. As a preliminary matter, it is unclear whether NGA was aware of Gates' alleged disability. Gates completed a medical questionnaire upon her return to work after her heart incident indicating that she has an internal defibrillator but, as noted by

11

the Court above, there remains a dispute of fact regarding whether Gates discussed her alleged disability with her supervisors during her employment. Nevertheless, Gates was referred to the relevant office within NGA that provides services and accommodations to employees but Gates declined any accommodation (Doc. 44-21 at 39; Doc. 44-24 at 7). Even if the Court were to infer that NGA was aware of Gates' heart impairment and her defibrillator, there is nothing in the record to suggest a connection between the impairment and the adverse employment action. The record does not indicate, nor has Gates identified, any similarly situated employees who engaged in the same conduct but were treated differently. In fact, of the five employees for whom Ware was their first-line supervisor, only Gates received a minimally successful performance rating (Doc. 44-6; Doc. 44-15). Gates also cannot establish a temporal nexus between her heart incident and her termination nearly two years later. Regardless, the Court is "disinclined to declare a genuine issue of fact for trial based on temporal proximity alone." *Hill*, 737 F.3d at 1219. Further, NGA articulated a legitimate, nondiscriminatory reason for Gates' termination – Gates' performance. The record clearly supports the articulated reason; Gates was counseled on multiple occasions starting in mid-2011 regarding her performance. Indeed, Gates received several evaluations noting that she was performing at the "Minimally Successful" level. Although Gates adamantly disputes that she was performing poorly during her time at NGA, Gates is unable to overcome NGA's proffered reason with anything more than conjecture. *See Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (internal quotation marks and citations omitted) ("Plaintiff must substantiate [her] allegations with sufficient probative evidence that would support a finding in [her] favor based on more than mere speculation, conjecture, or fantasy."). Therefore, the Court cannot find that Gates suffered an adverse employment action because of her disability.

In sum, the Court finds that the facts, viewed in the light most favorable to Gates, do not support a claim of disability discrimination under the Rehabilitation Act.

### IV. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Robert Cardillo's Motion for Summary Judgment (Doc. 42) is **GRANTED** and this action is **DISMISSED, with prejudice**.

A separate Judgment will accompany this order.

Dated this 16th day of May, 2019.

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE